JS 44  (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MAN-U Service Contract Trust Fund on behalf of itself and all others similarly situated | TEVA Pharmaceuticals USA, Inc., et al. (see appendix for additional defendants) |

(b) County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Montgomery County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

see appendix

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY

☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

☐ 375 False Claims Act
☐ 400 State Reapportionment
☒ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
15 USC § 1, 2, 6

Brief description of cause:
Civil antitrust action in connection with scheme to exclude competition

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$5,000,000.00 +

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE  Hon. Mitchell S. Goldberg   DOCKET NUMBER  see appendix

DATE  12/04/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## APPENDIX for CIVIL COVER SHEET

I.     **Defendants**
TEVA PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation
BARR PHARMACEUTICALS INC., a Delaware corporation
BARR LABORATORIES INC., a Delaware corporation
DURAMED PHARMACEUTICALS INC. (n/k/a TEVA WOMEN'S HEALTH INC.), a Delaware corporation
DURAMED PHARMACEUTICALS SALES CORP., a Delaware corporation
BOEHRINGER INGELHEIM PHARMA GMBH & CO.  KG, a German limited partnership
BOEHRINGER INGELHEIM INTERNATIONAL GMBH, a German limited liability company BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware corporation

VII.   **Related Cases Docket Numbers**
FRATERNAL ORDER OF POLICE MIAMI LODGE 20, INSURANCE TRUST FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06999 (E.D. Pa. Dec 03, 2013), Court Docket (12/03/2013)

ROCHESTER DRUG CO-OPERATIVE, INC. v. BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG et al, Docket No. 2:13-cv-06992 (E.D. Pa. Dec 02, 2013), Court Docket (12/02/2013)

UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06734 (E.D. Pa. Nov 20, 2013), Court Docket (11/20/2013)

PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06692 (E.D. Pa. Nov 18, 2013), Court Docket (11/18/2013)

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 132 HEALTH AND WELFARE FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06579 (E.D. Pa. Nov 13, 2013), Court Docket (11/13/2013)

MIAMI-LUKEN, INC. v. BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG et al, Docket No. 2:13-cv-06543 (E.D. Pa. Nov 08, 2013), Court Docket (11/08/2013)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

MAN-U Service Contract Trust Fund           :            CIVIL ACTION
on behalf of itself and all others          :
similarly situated          v.              :
                                            :
TEVA Pharmaceuticals USA, Inc., et al.      :            NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )


12/04/2013                  Jacob A. Goldberg, Esq.      MAN-U Service Contract Trust
**Date**                    **Attorney-at-law**          **Attorney for**

215-567-3500                215-567-6019                 jgoldberg@cprlaw.com

**Telephone**               **FAX Number**               **E-Mail Address**


(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 7130 Columbia Gateway Drive, Suite A, Columbia, MD 21046

Address of Defendant: 1090 Horsham Road, P.O.Box 1090, North Wales, PA

Place of Accident, Incident or Transaction: Pennsylvania and throughout the United States
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes☐ No☒

Does this case involve multidistrict litigation possibilities?  Yes☒ No☐

*RELATED CASE, IF ANY:*
Case Number: see appendix   Judge Hon. M. Goldberg   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☒ No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, JACOB A. GOLDBERG , counsel of record do hereby certify:
☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 12/04/2013   _____   66399
Attorney-at-Law   Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/04/2013   _____   66399
Attorney-at-Law   Attorney I.D.#

CIV. 609 (5/2012)

## APPENDIX TO DESIGNATION FORM

**Related Cases:**

FRATERNAL ORDER OF POLICE MIAMI LODGE 20, INSURANCE TRUST FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06999 (E.D. Pa. Dec 03, 2013), Court Docket (12/03/2013)

ROCHESTER DRUG CO-OPERATIVE, INC. v. BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG et al, Docket No. 2:13-cv-06992 (E.D. Pa. Dec 02, 2013), Court Docket (12/02/2013)

UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06734 (E.D. Pa. Nov 20, 2013), Court Docket (11/20/2013)

PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06692 (E.D. Pa. Nov 18, 2013), Court Docket (11/18/2013)

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 132 HEALTH AND WELFARE FUND v. TEVA PHARMACEUTICALS USA, INC. et al, Docket No. 2:13-cv-06579 (E.D. Pa. Nov 13, 2013), Court Docket (11/13/2013)

MIAMI-LUKEN, INC. v. BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG et al, Docket No. 2:13-cv-06543 (E.D. Pa. Nov 08, 2013), Court Docket (11/08/2013)

APPENDIX G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MAN-U Service Contract Trust Fund on behalf
of itself and others similarly situated    :
                          v.                :
TEVA Pharmaceuticals USA, Inc., et al.      :      Civil Action
                                            :      No: _____
                                            :

DISCLOSURE STATEMENT FORM

Please check one box:

☒        The nongovernmental corporate party, <u>MAN-U Service Contract Trust Fund</u>
         , in the above listed civil action does not have any parent corporation and
         publicly held corporation that owns 10% or more of its stock.

☐        The nongovernmental corporate party, _____
         , in the above listed civil action has the following parent corporation(s) and
         publicly held corporation(s) that owns 10% or more of its stock:

_____
_____
_____
_____

__12/04/2013_____          _____
Date                                  Signature

                    Counsel for:   MAN-U Service Contract Trust Fund
                                   _____

**Federal Rule of Civil Procedure 7.1 Disclosure Statement**
    (a)    WHO MUST FILE; CONTENTS.  A nongovernmental corporate party must file
           two copies of a disclosure statement that:
           (1)    identifies any parent corporation and any publicly held corporation
                  owning10% or more of its stock;  or

           (2)    states that there is no such corporation.

    (b) TIME TO FILE; SUPPLEMENTAL FILING.  A party must:
           (1)    file the disclosure statement with its first appearance, pleading,
                  petition, motion, response, or other request addressed to the court;
                  and
           (2)    promptly file a supplemental statement if any required information
                  changes.

APPENDIX G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MAN-U Service Contract Trust Fund on behalf
of itself and others similarly situated    :
                          v.                :
TEVA Pharmaceuticals USA, Inc., et al.      :          Civil Action
                                            :          No: _____
                                            :

DISCLOSURE STATEMENT FORM

Please check one box:

☒          The nongovernmental corporate party, MAN-U Service Contract Trust Fund
           , in the above listed civil action does not have any parent corporation and
           publicly held corporation that owns 10% or more of its stock.

☐          The nongovernmental corporate party, _____
           , in the above listed civil action has the following parent corporation(s) and
           publicly held corporation(s) that owns 10% or more of its stock:

_____

_____

_____

_____

12/04/2013 _____          _____
Date                                Signature

           Counsel for:   MAN-U Service Contract Trust Fund
                          _____

**Federal Rule of Civil Procedure 7.1 Disclosure Statement**
   (a)    WHO MUST FILE; CONTENTS.  A nongovernmental corporate party must file
          two copies of a disclosure statement that:
          (1)   identifies any parent corporation and any publicly held corporation
                owning 10% or more of its stock;  or

          (2)   states that there is no such corporation.

   (b) TIME TO FILE; SUPPLEMENTAL FILING.  A party must:
          (1)   file the disclosure statement with its first appearance, pleading,
                petition, motion, response, or other request addressed to the court;
                and
          (2)   promptly file a supplemental statement if any required information
                changes.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MAN-U SERVICE CONTRACT TRUST FUND on behalf of itself and all others similarly situated, | |
| *Plaintiff,* | Civil Action No. _____ |
| v. | **CLASS ACTION** |
| TEVA PHARMACEUTICALS USA, INC., a Delaware corporation, TEVA PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation, BARR PHARMACEUTICALS INC., a Delaware corporation, BARR LABORATORIES INC., a Delaware corporation, DURAMED PHARMACEUTICALS INC. (n/k/a TEVA WOMEN'S HEALTH INC.), a Delaware corporation, DURAMED PHARMACEUTICALS SALES CORP., a Delaware corporation, BOEHRINGER INGELHEIM PHARMA GMBH & CO.  KG, a German limited partnership, BOEHRINGER INGELHEIM INTERNATIONAL GMBH, a German limited liability company, and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**CLASS ACTION COMPLAINT**

Plaintiff Man-U Service Contract Trust Fund ("Man-U") on behalf of itself and all

others similarly situated, files this Class Action Complaint ("Complaint") against Defendants

Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Limited, Barr Pharmaceuticals

Inc., Barr Laboratories Inc., Duramed Pharmaceuticals Inc. (n/k/a Teva Women's Health Inc.),

Duramed Pharmaceuticals Sales Corp., Boehringer Ingelheim Pharma Gmbh & Co.  Kg,

Boehringer Ingelheim International Gmbh, and Boehringer Ingelheim Pharmaceuticals, Inc.,

(together, "Defendants").  Plaintiff alleges as follows based on:  (a) personal knowledge as to

facts relating to itself; (b) the investigation of its counsel; and (c) information and belief.

## I.       NATURE OF THE CASE

1.       This is a class action, alleging violation of civil antitrust laws on behalf of a Class

of indirect purchasers of the drug Aggrenox since August 14, 2009.  Defendant Boehringer

Ingelheim Pharmaceuticals, Inc. and its affiliates ("Boehringer") developed Aggrenox,

combining extended-release dipyridamole with acetylsalicylic acid, aspirin, to lower the risk of

stroke in patients whose blood clots have caused a transient ischemic attack or stroke.

2.       Plaintiff and members of the Class indirectly purchased, reimbursed or otherwise

paid for Aggrenox at a time when Boehringer orchestrated a scheme to prevent Plaintiff and the

Class from purchasing a less expensive, generic equivalent of Aggrenox.  In violation of federal

and state antitrust laws, Boehringer conspired with certain generic pharmaceutical manufacturers

to pay them not to produce and sell a generic equivalent of Aggrenox.  As a direct result of

Defendants' scheme, among other relief, Plaintiff and members of the Class seek an order

awarding them damages and enjoining Defendants' anticompetitive conduct.

3.       In December, 1999, armed with a patent for its development, Boehringer began

marketing and selling Aggrenox.  Over time, sales of Aggrenox increased and were very

profitable for Boehringer, reaching $366 million in 2008.  Anticipating the expiration of

Boehringer's patent, however, in January, 2007, Barr Pharmaceuticals, Inc. ("Barr") submitted

an application for regulatory approval to manufacture and market generic Aggrenox.

4.      To delay the substantial loss of profits it would suffer from competing generic equivalent, Boehringer negotiated and executed an exclusion payment agreement – a "pay-for-delay" agreement – with Barr.   Under its terms, Barr agreed to delay until July 2015 manufacturing and marketing generic Aggrenox in exchange for a co-promotion agreement worth an estimated $120 million in one-time and yearly royalty payments far exceeding the value of the services Barr provided and Barr's agreement not to compete with Boehringer's own authorized generic Aggrenox product.

5.      This illegal agreement between defendants Boehringer and Barr delayed the entry onto the market of less expensive generic equivalents of Aggrenox.   As a direct result of defendants' pay-for-delay agreement, Plaintiff and the members of the Class have paid far more for Aggrenox than they would have had Boehringer allowed Barr to manufacture and market a generic equivalent.   Defendants' anti-competitive conduct has illegally inflated their profits from Aggrenox, in turn inflating the prices that Plaintiff and members of the Class paid.

6.      On behalf of the Class, Plaintiff seeks a judgment declaring that Boehringer's exclusion payment agreement with Barr is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.   Plaintiff also seeks an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because, unless enjoined, the defendants' unlawful conduct will continue unchecked and plaintiff will continue to suffer  financial harm as a result of defendants' antitrust violations. Plaintiff also asserts claims for compensatory and treble damages and equitable relief for continuing violations of state antitrust laws and for and unjust enrichment.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount

in controversy exceeds $5,000,000, there are more than one hundred members of the proposed

class, and at least one member of the proposed class is a citizen of a state different from that of

one of the defendants.

8.     This Court also has jurisdiction over this matter under 15 U.S.C. § 26 and 28

U.S.C. §§ 1331 and 1337 because plaintiff brings claims under section 16 of the Clayton Act, 15

U.S.C. § 26, for injunctive and equitable relief to remedy the defendants' violations of Section 1

of the Sherman Antitrust Act, 15 U.S.C. § 1.  The Court has supplemental jurisdiction over

plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

9.     This Court has jurisdiction over defendants because they are present in the United

States, do business in the United States, have registered agents in the United States, may be

found in the United States, and are otherwise subject to the service of process provisions of 15

U.S.C. § 22.

10.     Venue is appropriate within this district under Section 12 of the Clayton Act, 15

U.S.C. § 22, and 28 U.S.C. §1391(b) and (c), because defendants transact business within this

district and because their interstate trade and commerce is carried out in substantial part in this

district.  In addition, one of the defendants is headquartered in this district.

### III.     PARTIES

#### A.     Plaintiff

11.     Plaintiff Man-U Service Contract Trust Fund is a trust, maintaining its principal

place of business at 7130 Columbia Gateway Drive, Suite A, Columbia, MD 21046.  Plaintiff

purchased and/or provided reimbursement for some or all of the purchase price of Aggrenox,

other than for re-sale, in the District of Columbia, among other locations, between August 14,

2009 and the present, at supra-competitive prices.  As a direct result of its Aggrenox purchases

4

during the Class Period, Plaintiff has been injured, paying more than it would have absent defendants' unlawful scheme to delay the entry of generic equivalents of Aggrenox onto the market.

      **B.**     **Defendants**

12.     Defendant Teva Pharmaceuticals USA, Inc., a wholly-owned subsidiary of Teva Pharmaceuticals Industries Limited, is a Delaware corporation with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania.  It manufactures and distributes generic drugs for sale throughout the United States at the direction, under the control, and for the direct benefit of its parent company.

13.     Defendant Teva Pharmaceuticals Industries Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel.  Teva is a leading manufacturer of generic drugs, and is one of the largest sellers of generic drugs in the United States.  Teva purchased Barr Pharmaceuticals Inc. on December 23, 2008.

14.     Defendant Barr Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.

15.     Defendant Barr Laboratories, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.

16.     Defendant Duramed Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr.  In December

2008, when Teva purchased Barr, Duramed became a subsidiary of Teva and is now known as Teva Women's Health Inc.

17.     Defendant Duramed Pharmaceuticals Sales Corp. is a corporation organized under the laws of the state of Delaware, with a principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  It was a subsidiary of Barr until December 2008, when it became a subsidiary of Teva.

18.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

19.     Defendant Boehringer Ingelheim International GmbH is a limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

20.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut.

21.     All of the defendants ' actions described in this complaint are part of , and were in furtherance of , the illegal restraint of trade alleged herein , and were authorized , ordered , and performed by the defendants' various officers , agents , employees , or other representatives while actively engaged in the management of the defendants ' affairs , within the course and scope of their duties and employment , and with the actual , apparent or ostensible authority of the defendants.

## IV.     REGULATORY BACKGROUND

### A.     Generic Drugs Benefit Purchasers

22.     Generic competition allows purchasers at all levels of the pharmaceutical supply chain to purchase both the brand name drug and its generic equivalents at a reduced price. Generic competition to a single branded drug can provide billions of dollars in savings to consumers, insurers, pharmacies, and other drug purchasers.

23.     Generics that meet all of the requirements for approval are assigned an "AB" rating by the United States Food & Drug Administration.  The AB rating permits the generic drug to be substituted for the brand name drug at the pharmacy counter.  All states permit, and some states require, pharmacists automatically to substitute an AB-rated generic drug for the corresponding brand name drug unless the doctor has said that the prescription for the brand name product must be dispensed as written.

24.     Before generic equivalents enter the market, no competition exists for brand name drugs like Aggrenox.  As a result, brand name manufacturers like Boehringer can charge monopolistic prices without a material loss in sales volume.  Brand name drug manufacturers, therefore, have a strong interest in delaying generic competitors from entering the market as long as possible.

25.     As a matter of policy, many third-party payors such as health insurance plans and state Medicaid programs encourage providers to substitute AB-rated generic drugs for their branded counterparts.  Many consumers routinely switch from a branded drug to an AB-rated generic drug once the generic enters the market.  Upon becoming available, therefore, AB-rated generic drugs capture significant market share from their branded counterparts, reducing significantly the branded drug's unit and dollar sales.

26.     The first manufacturer of an AB-rated generic drug that competes with its branded equivalent typically prices the generic significantly below its branded counterpart.  As additional manufactures market AB-rated generics, competition causes prices on both the brand and generic equivalents already on the market to decline even further.  Indeed, typically, within six months of the first generic equivalent to enter the market, the branded drug often loses 80% or more of its market share.  Because generic equivalents can sell for approximately 15% of what the branded manufacturer charges, within one year of market entry, generic equivalents typically capture 90% of total sales.

**B.      The FDA Approval Process**

27.     Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), manufacturers who seek to market a new drug must apply for FDA approval to sell the drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392 .NDAs must include specific data concerning the safety and effectiveness of the drug and identify applicable patents.  *Id*. at §§ 355(a) & (b).

28.     When the FDA approves a brand manufacturer's NDA, the brand name manufacturer lists any patents it contends apply to the approved drug in a publication called the "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."  21 U.S.C. §355(j)(7)(A)(iii).  The FDA does not confirm the accuracy of the information supplied by the brand manufacturer.  After the FDA approves the NDA, the brand manufacturer may list additional patents relating to the drug in the Orange Book.

**C.      The Government Encourages and Facilitates the Approval
of Generic Drugs Through the Hatch-Waxman Amendments**

29.     In 1984, Congress amended the FDCA, enacting the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), known as the "Hatch-Waxman Amendments."  By the Hatch-Waxman Amendments, Congress intended to

simplify the regulatory hurdles for market entry of far less costly generic equivalents to branded drugs. The Hatch-Waxman Amendments lifted the requirement that generic manufactures submit their equivalents to the lengthy and costly NDA process, instead allowing them to expedite FDA approval by filing an Abbreviated New Drug Application ("ANDA").

30. If an ANDA applicant shows that the generic drug is "bioequivalent" to the brand name drug—that it contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug – then in its ANDA the generic manufacturer may rely on the scientific safety and effectiveness findings included in the brand name drug manufacturer's original NDA. 21 U.S.C. §355(j)(2)(A). The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the Act's requirements. 21 U.S.C. § 355((j)(4). The streamlined approval process under the Hatch-Waxman Amendments makes it easier for manufacturers to bring competing generic products to the market.

31. While the Hatch-Waxman Amendments seek to facilitate generic competition, the brand name manufacturer retains the right to enforce any patents associated with the drug. To gain regulatory approval under 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV), an ANDA application must also certify that the generic drug will not infringe the brand name drug's patents listed in the Orange Book, because either:

    a.  no patents exist on the brand name product;

    b.  the patents have expired;

    c.  the patents will expire by the time the generic product comes to market; or

    d.  the patents are invalid or will not be infringed by the sale of the generic product. This last certification – that the patents are invalid or not infringed – is known as a "Paragraph IV certification."

9

32.     When a generic manufacturer files a Paragraph IV certification asserting that a patent listed in the Orange Book is invalid or will not be infringed, it must promptly give notice of its certification to both the brand manufacturer and the owner of the patent.  If the brand manufacturer files a patent infringement lawsuit against the ANDA filer within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) 30 months or (b) a court ruling that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).  During the 30-month stay, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but cannot authorize the generic manufacturer to market its drug before the 30-month stay expires or a court rules on invalidity and infringement.

33.     Through Hatch-Waxman, Congress also created incentives for drug manufacturers to seek approval of generic alternatives to branded drugs and challenge weak patents.  The Hatch-Waxman Amendments grant a 180-day period of market exclusivity to the first ANDA applicant to file a substantially complete ANDA containing a Paragraph IV certification.  During the 180-day exclusivity period the first filer enjoys temporary freedom from competition from other generic versions of the drug, and is able to sell the generic for a higher price than when multiple generics enter the market.  The brand name manufacturer may, however, market its own generic equivalent of the brand name drug (known as an "authorized generic") during the 180-day period.

34.     The first-filed generic manufacturer can forfeit its right to the 180-day period of exclusivity.  This can occur, for example, when the first-filer fails to receive tentative approval of its ANDA from the FDA within 30 months of filing the ANDA.

**D.**     **Brand Name Manufacturers Game the Regulatory Structure**

35.     Because the Hatch-Waxman Amendments' regulatory scheme automatically delays approval of an ANDA whenever a brand name manufacturer sues the potential generic competitor for patent infringement, brand name manufacturers frequently take aggressive positions in listing patents in the Orange Book, and then bring patent lawsuits against any generic competitor that files an ANDA with a Paragraph IV certification.  Brand name manufacturers often sue generics simply to delay generic competition, rather than to enforce valid patents against infringing products.

36.     In an effort to continue reaping the benefits from patent protection for their branded drugs in the face of patent litigation arising from generic manufacturers' Paragraph IV certifications, brand name manufacturers have developed a potentially illegal settlement strategy.  To resolve patent claims, brand name manufacturers pay-off generic competitors in exchange for a delay in generic equivalent market entry.  These exclusion payment agreements are commonly known as "pay-for-delay agreements."

37.     By executing pay-for-delay agreements, brand name manufacturers preserve their increased profits by keeping their brand name monopolies intact.  In exchange for postponing patients' access to lower cost, generic equivalents, brand name manufacturers pay a portion of the monopoly profits to generic manufacturers.  Initially these agreements took the form of a straight cash payment from the brand name manufacturer to the generic competitor.  As a result of regulatory scrutiny, Congressional investigations, and class action lawsuits, however, brand name manufacturers and generic competitors have entered into increasingly elaborate agreements, attempting to mask their fundamentally anticompetitive character.  Because the

11

profits to be gained by delaying generic competition are so great, however, drug manufacturers retain the incentive to enter into such agreements.

38.     The first ANDA filer's agreement to delay marketing a generic equivalent may also prevent other manufacturers of generics from bringing their own products to market. Because the first-filed generic manufacturer may be eligible for 180-days of marketing exclusivity, no other generic manufacturer can enter the market until the end of the exclusivity period.  This "bottlenecking" tactic is known as exclusivity "parking."

39.     In addition, brand and generic manufacturers can structure their settlements in a way that grants 180 days of exclusivity to the generic even where it is likely that the generic has forfeited that exclusivity under one of the applicable MMA forfeiture provisions, e.g., the failure to obtain tentative approval within 30 months of submitting a substantially complete ANDA. This results in a windfall to the generic and a subversion of the regulatory scheme.  Because FDA will not typically make a formal 180-day exclusivity determination until another generic applicant has received final approval and is ready to launch, settlements that retain de facto exclusivity – even where it should be forfeit de jure under the MMA – dissuade subsequent generic applicants from trying to obtain a court judgment of invalidity and/or infringement that would trigger the start of the 180 day period; because the lion's share of the generic revenues will perceivably go to the first filer, subsequent filers have less incentive to litigate to judgment.

**E.     No-Authorized-Generic Agreements**

40.     The 180-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day period.  Such an "authorized generic" is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if

it has one) or through a third-party generic manufacturer.  While competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, it also substantially reduces drug prices for consumers.

41.    In its recent study, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (August 2011) (the "FTC Study"), the Federal Trade Commission found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

42.    Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers such as Plaintiff and the End-Payor Class benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

43.    Given the significant negative effect of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers such as Plaintiff and the End-Payor Class of the lower prices resulting from two forms of competition: (1) among the branded and the generic products; and (2) between the generic products.

44.    Agreements not to compete with an authorized generic can take many forms. According to the FTC Study, one such form includes agreements whereby the brand name

13

manufacturer agrees to supply the first-filing generic with the authorized generic product exclusively.  The result is no competition between an authorized generic and the first-filing generic's product for a period of time.

## V.  THE AGGRENOX PAY-FOR-DELAY AGREEMENT

### A.  Boehringer Starts Marketing Aggrenox in December 1999

45.  Boehringer developed Aggrenox as a treatment to lower the risk of stroke in patients who have had a transient ischemic attack (also known as a 'mini stroke') or stroke due to a blood clot.  A transient ischemic attack is similar to a stroke, except it usually lasts only a few minutes and does not result in permanent damage.  Aggrenox is a single gelatin capsule containing 200mg of extended-release dipyridamole and 25mg of immediate-release acetylsalicylic acid (aspirin).  Boehringer has previously marketed dipyridamole as a stand-alone drug under the brand name Persantine to prevent clots from forming after heart valve replacements and aspirin has previously been prescribed for the prevention of strokes.

46.  Boehringer filed NDA 020884 for Aggrenox and on November 22, 1999 received FDA approval to market Aggrenox to help reduce the risk of repeat strokes.  Boehringer submitted Patent No. 6,015,577 (the "'577 Patent") to the FDA for listing in the Orange Book. This patent was for a composition of dipyridamole and acetylsalicylic acid for oral administration.  The '577 Patent is scheduled to expire on January 18, 2017.

47.  Boehringer began marketing Aggrenox in December 1999.  Aggrenox was the only prescription drug for reducing the risk of subsequent stroke through a single aspirin and extended-release dipyridamole capsule.  Studies submitted to the FDA by Boehringer showed that Aggrenox's combined dipyridamole-aspirin formulation is more effective at reducing the risk of future stroke than administration of either ingredient on its own.

14

48.     Aggrenox quickly became a commercial success and a steady source of profits for Boehringer.  By 2008 Aggrenox sales in the United States had reached $366 million.

**B.     Barr Seeks FDA Approval to Market a Generic Equivalent to Aggrenox**

49.     On January 31, 2007, Barr submitted ANDA 78-804 to the FDA, seeking approval to market a generic equivalent of Aggrenox.  It submitted amendments to its ANDA on May 30, August 10, and November 14, 2007; June 6, August 25, and August 26, 2008; and July 1, July 13, July 14, and July 20, 2009.  Barr was the first generic manufacturer to submit a substantially complete ANDA for generic Aggrenox with a Paragraph IV certification for the '577 Patent.

50.     On May 31, 2007, Barr notified Boehringer that it had submitted ANDA 78-804 and a Paragraph IV certification regarding the '577 Patent, asserting that its generic would not infringe the patents and/or that the patents were invalid or unenforceable.

51.     On July 11, 2007, Boehringer sued Barr for patent infringement in the United States District Court for the District of Delaware.  Boehringer's lawsuit triggered the 30-month stay that, under the Hatch-Waxman Amendments, prohibited the FDA from granting final approval of Barr's ANDA.

52.     Barr denied the allegations in Boehringer's complaint, and counterclaimed for declaratory relief of non-infringement, invalidity, and unenforceability of the '577 Patent.  Barr argued that Boehringer had misrepresented to the U.S. Office of Patents and Trademarks ("USPTO") the nature and materiality of a prior patent – Patent No. 5,694,024 – and its related reference DE-A1-3,515,874.  According to Barr, the properly disclosed patent and reference would have made the claims of the '577 Patent obvious.  In light of these allegations, Barr asked

the District Court to find the '577 Patent unenforceable. The patent lawsuit continued until August 2008 without any substantive rulings.

### C.    Boehringer and Barr Enter Into the Exclusion Payment Agreement

53.    On August 11, 2008 Boehringer and Barr announced that they had settled the patent litigation. On August 13, Boehringer and Barr filed a stipulation seeking dismissal of the patent litigation with prejudice in light of the settlement. The Court entered the stipulation and dismissed the case the next day.

54.    Under the terms of the settlement, Boehringer and Barr agreed that Barr would delay launching a generic equivalent of Aggrenox until at least July 1, 2015. The agreement unlawfully maintained Boehringer's exclusive right to sell Aggrenox, and Boehringer and Barr shared the revenue Boehringer derived as a result of its exclusivity (the "Exclusion Payment Agreement").

55.    The Exclusion Payment Agreement between Boehringer and Barr had several components:

a.    Settlement Agreement. Boehringer and Barr agreed to dismiss all claims and counterclaims in the patent litigation and Barr agreed to delay launching a generic version of Aggrenox until July 1, 2015. By granting Barr a license to market an authorized generic version of Aggrenox under Boehringer's NDA, Boehringer agreed not to compete against Barr with Boehringer's own authorized generic Aggrenox product. Absent the agreement, Boehringer had the incentive and ability to launch an authorized generic version of Aggrenox. The intended result of the agreement was that Barr would have de facto 180-day exclusivity for generic Aggrenox regardless of whether it was statutorily entitled to such exclusivity, and that there would be no competition between Barr's product and Boehringer's authorized generic product

16

during the 180 days of exclusivity and beyond.  This aspect of the agreement provides substantial compensation to Barr, which can expect to make approximately double the unit sales, at a much higher price, absent an authorized generic in the market.  These higher prices come at the expense of Plaintiff and the End-Payor Class.

       b.     Co-Promotion Agreement.  Boehringer agreed to pay Barr (through its subsidiary, Duramed, now known as Teva Women's Health) for co-promotion services related to sales of Aggrenox.  Boehringer agreed to train Duramed's 93-person Specialty Sales Force to promote Aggrenox to obstetricians, gynecologists, and women's health care professionals, beginning in March 2009 and continuing until Barr's generic product entered the market.  In exchange, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years.  The total value of these payments is an estimated $120 million.

       56.     Under the Exclusion Payment Agreement, Boehringer agreed to pay Barr in exchange for Barr's agreement to delay the entry date of its generic Aggrenox-equivalent.  In litigation with the Federal Trade Commission ("FTC") regarding the agency's investigation of Boehringer and Barr's agreements, Boehringer's counsel admitted that the Co-Promotion Agreement was the means by which Boehringer paid Barr to drop its patent challenge and delay its launch of generic Aggrenox onto the market.  He described it as "part and parcel of the settlement.  It was part of the flow of compensation.  It was part of the consideration of the settlement, so it is really a mischaracterization or misdescription to say that we said it was stand alone."

57.     At other points, Boehringer's counsel explained that:

        a.      The Settlement Agreement and Co-Promotion Agreement "were executed together.  The evidence is replete that [the co-promotion agreement was] part of the settlement"' and

        b.      "We have always said that the Aggrenox co-promote was part of the settlement.  It had – It absolutely was."

58.     The Co-Promotion Agreement was not a stand-alone business transaction, as evidenced by Boehringer's payments under the co-promotion agreement vastly exceed the value of the services provided by Barr and its subsidiaries.

59.     According to Boehringer's own counsel, documents related to the Co-Promotion Agreement "provide a blueprint for how a company can extract settlement payments out of not only our client, but virtually every branded pharmaceutical company."

**D.     Teva Acquires Barr and Continues the Unlawful
        Agreement to Suppress Generic Competition**

60.     On December 23, 2008, Teva acquired Barr and stepped into Barr's shoes with respect to the Exclusion Payment Agreement.  Teva has continued to refrain from entering the market with a generic equivalent of Aggrenox.  Teva thus joined the ongoing unlawful course of conduct—and joined the unlawful agreements, collusion and conspiracy—to suppress generic competition of Aggrenox.  Teva did not withdraw from the conspiracy, and instead continued to participate in it.

61.     As a result of its acquisition of Barr, Teva would own (either directly or indirectly) ANDA 78-804 and the 180-day exclusivity period that Barr may be entitled to as the first filer.

62.     Post-acquisition, Teva/Barr continued to pursue approval of ANDA 78-804.  On August 14, 2009 the FDA granted final approval of ANDA 78-804 for a generic equivalent of Aggrenox, and noted that Teva/Barr may have forfeited its 180-day exclusivity for failing to receive tentative approval within the requisite 30 months.  Because of the Exclusion Payment Agreement, no generic equivalent of Aggrenox is on the market and none will be so until July 1, 2015.

**E.     The Unlawful Agreement to Suppress Generic Competition Is Ongoing and Continues to Cause Harm**

63.     As of the filing of this complaint, no generic equivalent of Aggrenox is available in the United States.  Another generic manufacturer has filed an ANDA for generic Aggrenox that includes a Paragraph IV certification for the '577 Patent.  Neither the 30-month stay nor the litigation itself is expected to conclude prior to July 2015.  No generic Aggrenox product will enter the market prior to July 2015.  If Teva is found eligible for 180 days of marketing exclusivity and launches a generic equivalent of Aggrenox on July 1, 2015, the earliest another company can introduce a generic equivalent of Aggrenox is December 2015.

64.     The lack of generic competition is the direct result of the ongoing unlawful agreement that began in 2008, has continued since then, and will continue at least through July 1, 2015.  Boehringer continues to sell brand name Aggrenox at artificially inflated prices, and plaintiff has been denied the lower prices that generic competition would have brought to the market.

65.     During the four-year period prior to the filing of this complaint, the defendants' unlawful conduct was ongoing and plaintiff and class members were injured every day that the defendants' unlawful agreement was in place.

66.     But for the anticompetitive, illegal, and ongoing conduct alleged in this complaint, plaintiff and class members would have had access to less expensive versions of Aggrenox much sooner than they currently will.  The defendants have injured Plaintiff and Class members by causing them to pay substantial overcharges – potentially hundreds of millions of dollars – on their purchases of Aggrenox.

**F.      The Federal Trade Commission Opens an
          Investigation Into the Exclusion Payment Agreements**

67.     On January 15, 2009, the FTC issued a Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation to determine "whether Boehringer Ingelheim Pharmaceuticals, Inc. and Barr Pharmaceuticals, Inc., and their affiliates, or any other person, has engaged or is engaging in unfair methods of competition . . . with respect to the sale of Aggrenox or its generic equivalents and Mirapex and its generic equivalents."  FTC File No. 091-0023; see Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc. , Case No. 1:09-mc-00564-JMF, Dkt. # 1-1, at 3 (D.C.).  As the FTC explained, "[c]ompensation rarely takes the form of explicit cash payments; instead, the settling firms typically include the payment in a separate business deal executed simultaneously with the settlement."  Case No. 12-5393 (D.C. Cir.), Brief of Appellant Federal Trade Commission, Doc. #1444255, p. 9 ("FTC Brief").

68.     Pursuant to Sections 3 and 9 of the FTC Act, 15 U.S.C. §§ 43 and 49, on February 5, 2009 the FTC issued a subpoena to Boehringer seeking 37 categories of documents, including documents related to the settlements of the Aggrenox litigation and the Co-Promotion Agreement.  The FTC subpoena seeks – and Boehringer has refused to provide – its internal financial analysis regarding whether the payments Boehringer made to Barr under the Co-Promotion Agreement were for promotional services alone, or "side-payments for an

anticompetitive agreement to delay generic entry and share the ensuing monopoly profits?"  FTC Brief, at p. 2.

69.     Boehringer refused to produce documents that would substantiate its assertion that the Co-Promotion Agreement provided Boehringer with substantial value aside from the benefits it derived from delaying generic competition for Aggrenox. In light of Boehringer's refusal to turn over the relevant documents in response to the FTC's subpoena, on October 23, 2009 the FTC filed a petition with the District Court for the District of Columbia to enforce the subpoena. The FTC's petition did not specify the size of the payments from Boehringer to Barr under the Co-Promotion Agreement, and no other document filed publicly on the District Court docket contained this information.

70.     On December 12, 2012, after the District Court had determined that Boehringer's internal financial analyses regarding the Co-Promotion Agreement were privileged and in large part denied the FTC's petition, the agency filed a Notice of Appeal with the United States Court of Appeals for the District of Columbia.

71.     While Boehringer has not provided the FTC with its internal financial analyses, the FTC is in possession of the terms of the Co-Promotion Agreement.  Based on this information, the FTC described the payments under the Co-Promotion Agreement as a "significant financial transaction."  *Id*. at 36, n. 12.  In a June 28, 2013 brief to the United States Court of Appeals for the District of Columbia, the FTC argued that, "[u]nder the agreement, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years. . . .  In 2008, Aggrenox had total U.S. sales of about $366 million. . . .   At this level of sales, the FTC estimates that the deal would ultimately cost

Boehringer over $120 million in royalties." *Id.* The litigation and the FTC's investigation are ongoing.

## VI.    MARKET CHARACTERISITICS FOR AGGRENOX

72.    At all relevant times, Boehringer has had the power to maintain the price of Aggrenox at monopolistic levels without losing substantial sales to competing, generic equivalents.

73.    Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than an AB-rated generic equivalent of Aggrenox.

74.    Because of its unique profile as a combined aspirin and extended-release dipyridamole treatment for subsequent strokes, Aggrenox is differentiated from all products other than AB-rated generic equivalents of Aggrenox. Aggrenox's specific ratio of dipyridamole to aspirin and the release formulations of those components also differentiate it from products aside from AB-rated generic equivalents.

75.    Boehringer needed to control only Aggrenox (and any AB-rated generic equivalents to Aggrenox), and no other products, to maintain the price of Aggrenox profitably at monopolistic prices. Only the market entry of a competing AB-rated generic equivalent to Aggrenox would render Boehringer unable to profitably maintain monopolistic prices of Aggrenox without losing substantial sales.

76.    Boehringer also sold branded Aggrenox at prices well in excess of marginal costs and the competitive price, and enjoyed high profit margins.

77.    The defendants have had and continue to exercise the power to exclude generic competition to branded Aggrenox.

78.     At all relevant times, the defendants enjoyed high barriers to entry with respect to the market for Aggrenox products.

79.     To the extent that plaintiff is legally required to define a relevant product market; plaintiff alleges that the relevant market is all Aggrenox products, which includes Aggrenox and AB-rated bioequivalent products.  During the relevant time period, the defendants have been able to profitably maintain the price of Aggrenox well above competitive levels.

80.     The relevant geographic market is the United States and its territories.

81.     At all relevant times, Boehringer has had a 100% market share in the relevant market, and will continue to have that market share until July 2015.

## VII.     MARKET EFFECTS OF DEFENDANTS' ANTICOMPETITIVE SCHEME

82.     Boehringer began marketing Aggrenox in December 1999.  No generic equivalent of Aggrenox has ever been available for purchase in the United States.  The defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining and injuring competition by protecting Aggrenox from generic competition.  But for the unlawful Exclusion Payment Agreement: (a) Barr would have entered the market upon receiving final FDA approval or agreed to an unrestrained licensed entry date much earlier than July 1, 2015; and (b) Boehringer would have launched an authorized generic version of Aggrenox simultaneously with the launch of Barr's generic Aggrenox product.

83.     But for the defendants' illegal conduct, generic competition would have forced a decrease in the price of branded Aggrenox, and price competition among the suppliers of branded and generic Aggrenox would have been intense.

84.     But for the defendants' illegal conduct, plaintiff and class members would have paid less for Aggrenox or a generic equivalent.  The defendants' conduct directly injured

plaintiff and class members because it forced them to pay hundreds of millions of dollars in overcharges on their Aggrenox purchases.

85.     As a result of the delay in generic competition brought about by the defendants' anticompetitive scheme, plaintiff and class members paid more for Aggrenox products than they would have paid absent the defendants' illegal conduct.

86.     Barr had extensive experience in the pharmaceutical industry, including experience obtaining approval of ANDAs, manufacturing commercial launch quantities adequate to meet market demand, and marketing generic pharmaceutical products.

87.     Upon entering the market, generic equivalents of brand name drugs are priced significantly below the branded drug to which they are AB-rated.  When multiple generic products are on the market, prices for the brand drug and its generic equivalents fall even further because of the increased competition.

88.     If generic competition for Aggrenox had not been unlawfully delayed, end-payors would have paid less for Aggrenox by (a) substituting purchases of less-expensive AB-rated generic equivalents of Aggrenox for their purchases of more-expensive brand Aggrenox, and (b) purchasing brand name Aggrenox at a reduced price.

89.     Thus, the defendants' unlawful conduct deprived plaintiff of the benefits of competition that the antitrust laws were designed to ensure.

## VIII.   ANTITRUST IMPACT OF DEFENDANTS' SCHEME

90.     During the relevant period, plaintiff and class members purchased substantial amounts of Aggrenox indirectly from Boehringer.  As a result of the defendants' illegal conduct, these purchasers were compelled to pay artificially inflated prices for Aggrenox.  Those prices

were substantially higher than the prices that plaintiff and class members would have paid absent the illegal conduct alleged in this complaint.

91.     As a consequence, purchasers of Aggrenox have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

92.     Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and foreign commerce.

93.     At all material times, Boehringer manufactured, promoted, distributed, and sold substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.  Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering cheaper generic equivalents of Aggrenox to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

94.     At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Aggrenox.

95.     General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below.  *See* Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice (1994) at 624.  Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.  He also says that "[t]heoretically, one can calculate the

percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

96.     The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Aggrenox to plaintiff and class members.

97.     Defendants' anticompetitive conduct enabled Boehringer to indirectly charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the defendants' unlawful actions.

98.     The prices were inflated as a direct and foreseeable result of defendants' anticompetitive conduct.

99.     The inflated prices that plaintiff and class members have paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## IX.     CLASS ACTION ALLEGATIONS

100.     Plaintiff, on behalf of itself and all proposed class members, seeks injunctive and equitable relief and damages, measured as overcharges, trebled, against the defendants.

101.     Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representative of a class defined as:

> All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Aggrenox, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, from August 14, 2009 through and until the anticompetitive effects of defendants' unlawful conduct cease.

102.     The following persons or entities are excluded from the proposed Class:

a.      Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

b.      All governmental entities, except for government funded employee benefit plans;

c.      All persons or entities who purchased Aggrenox for purposes of resale or directly from the defendants or their affiliates;

d.      Fully insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

e.      Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

f.      The judges in this case and any members of their immediate families.

103.    The class members are so numerous that joinder is impracticable.   Plaintiff believes that there are thousands of class members.

104.    Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all class members were damaged by the same wrongful conduct by the defendants in that they paid artificially inflated prices for Aggrenox and were deprived of the benefits of earlier and more robust competition from cheaper generic equivalents of Aggrenox as a result of the defendants' wrongful conduct.

105.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class members.

106.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

107.    Questions of law and fact common to the class members predominate over questions that may affect only individual class members because defendants have acted on grounds generally applicable to the entire class, making overcharge damages with respect to the class as a whole appropriate.

108.    Questions of law and fact common to all class members include:

a.    Whether Boehringer entered into a contract , combination , or conspiracy with Barr to restrain trade and , if so , whether it should be evaluated under the rule of per se illegality , the "rule of reason ," or some other rule or standard;

b.    Whether Teva joined the unlawful agreement on its own behalf and on behalf of Barr;

c.    Whether defendants unlawfully excluded competitors and potential competitors from the market for Aggrenox;

d.    Whether defendants unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

e.    Whether defendants' conduct substantially affected interstate commerce;

f.    Whether , and to what extent , defendants ' conduct caused antitrust injury to plaintiff and class members; and

g.    The aggregate amount of overcharge damages to be awarded to the class.

109.    Class action treatment is a superior method for the fair and efficient adjudication of this case.  Class treatment will permit a large number of similarly situated, geographically dispersed persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through

the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in the management of this class action.

110.   Plaintiff knows of no special difficulty to be encountered in litigating its claims that would preclude the maintenance of this case as a class action.

## X.        FRAUDULENT CONCEALMENTTOLLED THE STATUTE OF LIMITATIONS

111.   Plaintiff and class members had no knowledge of the defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

112.   This is true because the nature of defendants' conspiracy was self-concealing and because the defendants employed deceptive practices and techniques of secrecy to avoid detection of, and fraudulently to conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from plaintiff and class members by, among other things:

a.        Concealing the amounts that Boehringer was to pay and paid Barr/Teva under the Exclusion Payment Agreement;

b.        Concealing the fact that the purpose of the payments under the Co-Promotion Agreement was to provide compensation to Barr / Teva in connection with the settlement of the '577 Patent litigation and the entry date for Barr / Teva's generic product;

c.        Concealing the fact that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

d.     Filing documents with the SEC that failed to disclose the existence or nature of the Exclusion Payment Agreement.  Teva's fiscal year 2008 20-F did not mention the settlement of the Aggrenox litigation.  The 20-F also mentioned a co-promotion agreement for a different pharmaceutical product, but did not mention the Aggrenox Co-Promotion Agreement. Teva's 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the Co-Promotion Agreement.

113.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by defendants and their co-conspirators, plaintiff and class members had no knowledge of the conspiracy more than four years prior to the filing of this complaint, or of the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

114.    Plaintiff and class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred, including the amounts of payments made from Boehringer to Barr / Teva under the Co-Promotion Agreement. Reasonable diligence on the part of Plaintiff and class members would not have uncovered those facts more than four years prior to the filing of this complaint.

115.    As a result of defendants' fraudulent concealment, all applicable statutes of limitations affecting plaintiff's and class members' claims have been tolled.

116.    Alternatively, if the statute of limitations is not tolled, this complaint alleges a continuing course of conduct (including conduct within the limitations period), and plaintiff and class members can recover damages they suffered during the limitations period.

## XI.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**For Declaratory and Injunctive Relief**
**Under Section 16 of the Clayton Act**
**for Violations of Section 1 of the Sherman Act**
**(Against All Defendants)**

117.   Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein

118.   The defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of Aggrenox.   The intended and accomplished goal of the scheme was to use restrictive and exclusionary conduct to delay Barr and Teva's launch date for the first generic equivalent of Aggrenox.  The defendants injured plaintiff and class members through an agreement to exclude generic Aggrenox products from the market in exchange for substantial payments to Barr and Teva.

119.   Had manufacturers of generic Aggrenox products entered the market and lawfully competed with Boehringer in a timely fashion, plaintiff and class members would have substituted lower-priced generic Aggrenox products for the higher-priced brand name Aggrenox for some or all of their purchases, and would have paid lower net prices on their remaining Aggrenox purchases.

120.   The defendants intended, and accomplished, a horizontal market allocation of the Aggrenox market, which is a per se violation of Section 1 of the Sherman Act.   By their agreement, the defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.  As a result of this

unreasonable restraint on competition, plaintiff and class members paid artificially inflated prices for Aggrenox.

121.    Plaintiff and class members have suffered harm, and will continue to suffer harm in the future as a result of paying higher prices for Aggrenox than they would have absent defendants' anticompetitive conduct and continuing anticompetitive agreement.  Plaintiff and class members also face a continuing threat of injury from the unlawful conduct alleged in this complaint.

122.    Plaintiff and class members have purchased substantial amounts of Aggrenox indirectly from Boehringer.

123.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

124.    Plaintiff and class members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that the defendants' conduct violates Section 1 of the Sherman Act.

125.    Plaintiff and the class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF
### For Conspiracy and Combination in
### Restraint of Trade Under State Law
### (Against All Defendants)

126.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

127.    In 2008, Boehringer and Barr entered into the Exclusion Payment Agreement to suppress generic competition with Aggrenox.  Teva joined and continued the unlawful agreement to suppress generic competition.  The Exclusion Payment Agreement was and is a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

a.      Allocate all sales of Aggrenox in the United States to Boehringer until at least July 1, 2015;

b.      Prevent each of the defendants from selling a generic equivalent of Aggrenox in the United States until July 1, 2015;

c.      Prevent Boehringer from competing against Barr/Teva with an authorized generic version of Aggrenox once Barr/Teva launch on July 1, 2015;

d.      Fix the price that plaintiff and class members paid for Aggrenox; and

e.      Fix the price that plaintiff and class members will pay for generic Aggrenox when it is launched on or after July 1, 2015.

128.    The Exclusion Payment Agreement has harmed plaintiff and class members as set forth above.

129.    The Exclusion Payment Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

130.    The Exclusion Payment Agreement is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal per se under state antitrust laws.  Alternatively, plaintiff alleges that the Exclusion Payment Agreement is an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis.

131.    There is and was no legitimate, non-pretextual, pro-competitive business justification for the Exclusion Payment Agreement that outweighs its harmful effect.  Even if there were such a justification, the Exclusion Payment Agreement is and was broader than necessary to achieve any conceivable pro-competitive purpose.

132.    The defendants' conduct violated state antitrust laws.

a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona by members of the Class.

b.    Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq. , with respect to purchases in California by members of the Class.

c.    D.C. Code Ann. §§ 28-4502, et seq., with respect to purchases in the District of Columbia by members of the Class.

d.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida by members of the Class.

e.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois by members of the Class.

f.    Iowa Code § 553.2 et seq. , with respect to purchases in Iowa by members of the Class.

g.      Kan. Stat. Ann. §§ 50-101, et seq. , with respect to purchases in Kansas by members of the Class.

h.      Mass. Gen. L. Ch. 93A, et seq. , with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Aggrenox and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

i.      Me. Rev. Stat. Ann. 10, § 1101, et seq. , with respect to purchases in Maine by members of the Class.

j.      Mich. Comp. Laws Ann. §§ 445.772, et seq. , with respect to purchases in Michigan by members of the Class.

k.      Minn. Stat. §§ 325D.51, et seq. , with respect to purchases in Minnesota by members of the Class.

l.      Miss. Code Ann. §§ 75-21-3, et seq. , with respect to purchases in Mississippi by members of the Class.

m.      Neb. Code Ann. §§ 59-801, et seq. , with respect to purchases in Nebraska by members of the Class.

n.      Nev. Rev. Stat. Ann. § 598A.060, et seq. , with respect to purchases in Nevada by members of the Class, in that thousands of sales of Aggrenox took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.      N.M. Stat. Ann. §§ 57-1-1, et seq. , with respect to purchases in New Mexico by members of the Class.

p.      New York General Business Law § 340, et seq. , with respect to purchases in New York by members of the Class.

q.      N.C. Gen. Stat. §§ 75-1, et seq. , with respect to purchases in North Carolina by members of the Class.

r.      N.D. Cent. Code § 51-08.1-02, et seq., with respect to purchases in North Dakota by members of the Class.

s.      Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by members of the Class.

t.      Pa. Stat. Ann. §§ 201–1, et seq., with respect to purchases in Pennsylvania by members of the Class.

u.      10 L.P.R.A. § 251, et seq. , with respect to purchases in Puerto Rico by members of the Class.

v.      R.I. Gen. Laws §§ 6-36-4 et seq., with respect to purchases in Rhode Island by members of the Class.

w.      S.D. Codified Laws Ann. § 37-1-3.2, et seq., with respect to purchases in South Dakota by members of the Class.

x.      Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah by members of the Class.

y.      Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Aggrenox and AB-rated generic equivalents at Tennessee pharmacies.

z.      Vt. Stat. Ann. 9, § 2453, et seq. , with respect to purchases in Vermont by members of the Class.

aa.      W.Va. Code §§ 47-18-3, et seq. , with respect to purchases in West Virginia by members of the Class.

bb.      Wis. Stat. § 133.03, et seq. , with respect to purchases in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end- payors in Wisconsin paying substantially higher prices for Aggrenox at Wisconsin pharmacies.

133.    Plaintiff and class members have been injured in their business or property by defendants' antitrust violations.  Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic Aggrenox products, and (2) paying higher prices for Aggrenox products than they would have paid in the absence of defendants' wrongful conduct.  These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes defendants' conduct unlawful.

134.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

135.    Plaintiff and class members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of the defendants' anticompetitive conduct.

136.    Defendants are jointly and severally liable for all damages suffered by plaintiff and class members.

137.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### THIRD CLAIM FOR RELIEF
#### For Unjust Enrichment
#### (Against All Defendants)

138.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

139.    To the extent required, this claim is pled in the alternative to the other claims in this complaint.

140.    Defendants have benefited from the overcharges on sales of Aggrenox made possible by the unlawful and inequitable acts alleged in this complaint.

141.    Defendants' financial benefits are traceable to plaintiff's and class members' overpayments for Aggrenox.

142.    Plaintiff and class members have conferred an economic benefit upon the defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of plaintiff and class members.

143.    It would be futile for plaintiff and class members to seek a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the benefits they received indirectly from plaintiff and class members.

144.    It would be futile for plaintiff and class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Aggrenox, as those intermediaries are not liable and would not compensate plaintiff and class members for defendants' unlawful conduct.

145.    The economic benefit defendants derived from charging monopolistic and artificially inflated prices for Aggrenox is a direct and proximate result of defendants' unlawful practices.

146.    The financial benefits defendants derived rightfully belong to plaintiff and class members, who paid anticompetitive prices that inured to defendants' benefit.

147.    It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia and Puerto Rico for defendants to retain any of the overcharges plaintiff and class members paid for Aggrenox that were derived from defendants' unfair and unconscionable methods, acts, and trade practices.

148.    Defendants are aware of and appreciate the benefits bestowed upon them by plaintiff and the class.

149.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of plaintiff and class members.

150.    A constructive trust should be imposed upon all unlawful or inequitable sums the defendants received that are traceable to plaintiff and class members.

151.    Plaintiff and class members have no adequate remedy at law.

152.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

## XII.   DEMAND FOR JUDGMENT

WHEREFORE, plaintiff, on its own behalf and on behalf of the proposed class, demands a judgment that:

A.      Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to class members under Rule 23(c)(2), and declares that plaintiff is a proper representative of the class;

B.      Declares that defendants' conduct violated Section 1 of the Sherman Act, the other statutes set forth above, and the common law of unjust enrichment;

C.      Enjoins defendants from continuing their illegal activities;

D.      Enters joint and several judgments against defendants and in favor of plaintiff and the class;

E.      Grants Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the defendant s' unjust enrichment;

F.      Awards Plaintiff and the Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.      Awards plaintiff and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants further relief as necessary to correct for the anticompetitive market effects caused by defendants' unlawful conduct, as the Court deems just.

## XIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff, on behalf of itself and the proposed class, demands a trial by jury on all issues so triable.

Dated: December 4, 2013                    Respectfully Submitted:

**COHEN, PLACITELLA & ROTH, P.C.**

/s/ Stewart L. Cohen
Stewart L. Cohen
Pa Bar No. 25448
Robert L. Pratter
Pa Bar No. 02556
Michael Coren
Pa Bar No. 31037
Jacob A. Goldberg
Pa Bar No. 66399
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA  19103
Tel: (215) 567-3500
scohen@cprlaw.com
rpratter@cprlaw.com
mcoren@cprlaw.com
jgoldberg@cprlaw.com

**MARKOWITZ & RICHMAN**
Stephen C. Richman
Pa Bar No. 15884
123 South Broad Street,
Philadelphia, PA 19109
Tel: (267) 528-0121
srichman@markowitzandrichman.com

***Attorneys for Plaintiff***